[No. 26500. Department Two. March 26, 1937.]

WILLIAM C. CHESS, *Appellant*, v. FRED O. REYNOLDS, *Respondent.*[1]

*Brown & Weller,* for appellant.

*Edge & Wilson* and *Norman dePender,* for respondent.

BEALS, J.—This case is the result of an automobile collision which occurred October 24, 1935, at a right angle country road intersection in the northern part of Spokane county. Plaintiff, a rural mail carrier, was

[1]Reported in 66 P. (2d) 297.

proceeding north, in the course of delivering his mail. Respondent was driving, in an easterly direction, a Dodge truck loaded with cans of milk. The automobiles collided at a point a little to the north of the center of the intersection. Plaintiff sued for damages resulting from personal injuries, alleging that the accident was the result of defendant's negligence, and defendant counterclaimed for damages to his truck and cargo. The action was tried to a jury, and resulted in a verdict in plaintiff's favor in the sum of five thousand dollars.

Answering special interrogatories, the jury found that the intersection belonged to that class which the law designates as obstructed; that plaintiff approached the intersection at a speed of twenty-five miles an hour, and did not reduce his speed prior to the collision; that defendant approached the intersection at the rate of twenty-five miles per hour, but reduced his speed to twenty miles prior to entering the intersection.

Defendant moved for judgment in his favor notwithstanding the verdict, or in the alternative for a new trial. The trial court granted defendant's motion for judgment, and also granted a new trial, upon the ground that the verdict was contrary to the weight of the evidence. The order granting a new trial was not to become effective unless, on appeal, this court should reverse the order granting judgment in defendant's favor notwithstanding the verdict. From a judgment dismissing the action, plaintiff has appealed.

Error is assigned upon the granting of respondent's two motions. No question as to any right of respondent to recover damages against appellant is presented.

Appellant relies upon the well established rule that, in passing upon a motion for judgment notwithstanding the verdict, the court must consider the evidence in the light most favorable to the party in whose favor

the verdict of the jury was rendered; and that, in passing upon such a question, no element of discretion is presented, nor can the court weigh the evidence. We have repeatedly held that such a motion can be granted only in cases in which it can be held that, as matter of law, there is neither evidence nor reasonable inference from evidence to sustain the verdict.

Appellant was the favored driver, but by the special verdicts of the jury it has been established that the intersection was an obstructed one, and that appellant entered the same at a speed in excess of that provided by law.

While the intersection is in law classed as obstructed, as the northwest corner thereof was covered with a thick growth of trees, the corner between the approaching cars was obstructed only by some low brush, which, at the time of the accident, bore little foliage. Both parties were familiar with the intersection in question, and appellant had frequently observed respondent driving his truck, having met him once at this very crossing. Respondent saw appellant's automobile and, realizing that a collision was imminent, attempted to turn his truck to his left. The right front of respondent's truck struck appellant's car on the left side near the front.

Appellant swore positively that, before entering the intersection, he looked towards and along the crossroad on his left, along which respondent was approaching. Both roads were level, and good unpaved country roads. Concerning the approach to the intersection and his ability to see the crossroad from positions along the road upon which he was traveling, appellant testified, either on direct or cross examination, as follows:

"Q. As you were approaching that intersection that morning, Mr. Chess, did you look to your right and left

to see what the condition of things were? A. Yes, sir. Q. And what was the appearance of the road as you were approaching the intersection? A. Well, it was clear. I couldn't see anything. Q. Could you see to your left up the road? A. The first time I could see well. Q. And how far up the road could you see from the intersection? A. Better than 300 feet. Q. Better than 300 feet? Was there any vehicle in there? A. There wasn't. Q. By the way, Reynolds was coming in from the west? He was coming in from your left-hand side? A. Yes, sir. Q. Did you look to the right before you drove into the intersection? A. Yes. Q. Was there anything there? A. I couldn't see anything. There was nothing there. Q. Did you look again to your left before you went into the intersection? A. near the intersection I did. Q. And did you see any vehicle there? A. No.

"The Court: How near was that to the intersection, that last time? A. Oh, fifteen or twenty steps or some place in there.

"Mr. Brown: Q. You were fifteen or twenty steps back from the intersection when you looked again? A. Something like that. Q. Could you see up the road then? A. Well, fairly good. Q. And did you see any vehicle coming? A. No, I didn't. . . . Q. Then about how far were you in the intersection before you saw Reynolds' truck? A. Almost to the middle. . . . Q. Where was Reynolds' car when you first saw it? A. Right on me. Q. By right on you, how many feet away would you say? A. Not more than ten or fifteen, anyway. . . .

"Mr. Edge: Q. As you came up to this intersection from the south, say a distance of thirty or forty or fifty feet, and there was a truck coming in from the west forty or fifty or seventy feet, you could see the truck, of course, through that sparse foliage, couldn't you, wherever there wasn't any? Isn't that right? A. With that picture I can show you exactly. From here to here is thirty feet.

"The Court: From where to where? A. From this bunch of brush where I looked through here. This is 120 feet from the intersection and this is 150 feet. That is absolutely clear through there.

"Mr. Edge: Q. When you were 150 feet then from the intersection it was absolutely clear to look through and see this road coming from the west? That is correct? A. Back 300 feet across that other field. Q. Yes. In other words, when you were 150 feet south of this intersection you could see a truck that was any place within 350 feet of that intersection? A. 335. Q. You could see a truck any place in 335 feet there? A. Yes. Q. And at that time there was no truck in sight? A. There was not. Q. And you were traveling about what speed? A. I think about twenty-five miles an hour. Q. Now, then, when you got up, how close to the intersection would there be any change in your vision? Where could you see again? A. At that time, this wouldn't have obstructed the view very much. That might some, but not very much (witness indicating different patches of brush). Q. You are now referring to these clumps of brush that appear in the photograph in the southwest corner of the intersection? A. Well, this is 120 feet from the intersection but there are bunches along there; near the intersection here the brush at that place is a little dense, but just before I got to that there is an open place in there that you might see up the road a ways. Q. Just before you got to the intersection? How far from it would you say? A. Fifteen to twenty yards, some place in there. Q. Forty-five to fifty feet from the intersection there is another place where you can see mostly everything to the west? That is right, is it? A. Yes. Q. And could see a truck as large as Mr. Reynolds was driving at that place? A. You could see it if it was right close to the rear part of the brush up that way. Q. You had met Mr. Reynolds at various times out on the highway there, hadn't you, before this accident occurred? A. Often. Q. You had often met him right there at that intersection, hadn't you? A. I don't remember of but one time right there. Q. You did meet him once before right there? A. Yes. Q. He picked up milk from various farmers to whom you delivered mail? A. Yes, sir. Q. You never saw him until you were right here at the place where you have marked the car in Plaintiff's Exhibit 1. Is that correct? A. Yes. Probably just south I imagine. He was just about here. Q.

That is about where you marked it, wasn't it? A. Yes. Q. I will make a circle at that place and put the figure '4' there. That is where you were when you first saw Mr. Reynolds? A. Yes, probably a little closer than that because I didn't get very far when I was hit. Q. Even north of that, was it? A. Yes. Q. About here? A. No. Well, you see the way the car sat, I didn't get a car-length until I was hit. Q. In other words, you were within a car-length of where you were hit at the time you first saw Mr. Reynolds then? That is true, isn't it? A. Yes. Q. And you were hit right here where you have marked a rectangle with the figure '3' in it; that is correct, isn't it? A. Yes. Q. And you were within ten or twelve feet of that point when you first saw Mr. Reynolds? A. Pretty close to that. Q. Maybe less than that and maybe no more than that? That is correct? A. Just like a flash. Q. And you were then going— A. And then I was hit.

"Mr. Brown: Let him answer, please.

"Mr. Edge: Q. You say it was just a flash and then you were hit, is that correct? A. Yes, sir. . . . Q. Well, how far was it from where you could see to the left to where you were hit? In fact, you could see to the left back in here some place across the corner, couldn't you? A. No, there was brush here, a little. Q. But before you got to the intersection there were various places where you could see a vehicle coming from the west to the intersection? A. Practically clear. Q. Practically clear? A. Yes, sir. Q. For the last how many feet—100 or 200 feet? A. Well, I don't know. One hundred fifty feet down here there is a big bunch of brush. Q. Well, for 125 feet before you reached the intersection? A. For about 125 feet it was clear. Q. Then for 125 feet before you reached the intersection there was—it was clear to your left? A. With the exception of some right in here. There was a bunch of brush there, and another one there. (Witness indicating locations) Q. With the exception of a couple of small bunches of brush right at the corner of the intersection? A. Well, there is several when you look up the fence here, but they are not very big when you look at them endways. Q. But when you are back of the intersection you could see right through them? A. Yes.

Q. You could see a vehicle approaching? A. Yes, sir. Q. So that during the last 125 feet of your travel before you reached the intersection you could see any obstruction to the west and see a vehicle approaching, that is correct? A. With the exception of a little right here. Q. With the exception of a very small bunch of brush at the very corner? A. Yes. Q. What was the size of that little bunch of brush there at the corner? A. I just don't know exactly. Q. Three or four feet? A. Maybe—Oh, if it was spread out, maybe six or eight feet at the top; I imagine around six or eight feet. Q. But there were no leaves on it at that time of year, were there? A. Not so very many. Q. Just bare limbs of that brush there? And you never saw Mr. Reynolds' truck until you were at about the point '4' and a circle; that is correct? A. Yes, sir. Q. When you first saw Mr. Reynolds he was swinging to his left, was he not? A. Well, I imagine he was, just about to commence. Q. Swinging to his left to go with you? A. Yes.''

It appears from the testimony that appellant did not see respondent's truck until it was not over ten or fifteen feet from his car; that he neither applied his brakes nor made any attempt to slow down or turn to his right to avoid the collision. He also testified that he approached the intersection at a speed of about twenty-five miles per hour, and that he continued on through the intersection at exactly the same rate. The accident occurred about ten-thirty o'clock in the forenoon, and apparently the visibility was good. While appellant was the favored driver, the undisputed evidence clearly indicates that, while respondent's truck, which was a fairly large one, was in plain sight, appellant did not see it until practically the instant of contact. Appellant testified that he looked towards his left, but if he looked and did not see what was there, he is responsible for what he should have seen. Assuming respondent's negligence, we are satisfied that the trial court properly held that appellant was also

guilty of negligence which bars his recovery in this action, and that the motion for judgment in respondent's favor notwithstanding the verdict was properly granted.

We have examined the authorities relied upon by appellant, and are convinced that they do not support appellant's position upon this phase of the case. Appellant clearly admitted that he violated the law against proceeding through an obstructed intersection at a speed greater than fifteen miles per hour. It must be held that he should have known of the presence of respondent's truck. He should have seen what was there for him to see.

The decision of the trial court is supported by the cases of *Twedt v. Seattle Taxicab Co.*, 121 Wash. 562, 210 Pac. 20; *Benson v. Anderson*, 129 Wash. 19, 223 Pac. 1063; *Silverstein v. Adams*, 134 Wash. 430, 235 Pac. 784; *Strouse v. Smith*, 166 Wash. 643, 8 P. (2d) 411; *Metcalf v. Mud Bay Logging Co.*, 170 Wash. 59, 15 P. (2d) 278; *Butzke v. Hendrickson*, 172 Wash. 302, 20 P. (2d) 7.

The judgment of the trial court is clearly right, and the same is affirmed.

STEINERT, C. J., TOLMAN, HOLCOMB, and ROBINSON, JJ., concur.